[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a petition filed on March 1, 1996 through which the petitioner seeks a court order vacating his placement in Administrative Segregation and directing that he be placed in the general inmate population; an order that Disciplinary Reports pertaining to him be expunged from his Department of Corrections file; and, an order that the petitioner be afforded necessary medical care while in the custody of the Commissioner of Corrections. Given the nature of the petitioner's allegations concerning his medical care, the court bifurcated the issues in the petition and conducted a hearing on October 4, 1996 in regard to the petitioner's medical claims. Based on the evidence adduced CT Page 8686 at the hearing, the court makes the following findings and order.
The petitioner is currently a sentenced prisoner confined to the custody of the Commissioner of Corrections and presently housed at the Northern Correctional Facility.
On August 15, 1995, the petitioner was arrested on the charges of Violation of Probation violation of Connecticut General Statutes § 53a-32 and Assault in the Second Degree in violation of C.G.S. § 53a-60 and taken to the Bridgeport Community Correctional Facility for pre-trial confinement. While at the Bridgeport facility, the petitioner committed an assault which resulted in his transfer to the Northern Correctional Facility. Subsequently, on September 22, 1995, the petitioner was convicted by admission of Violation of Probation for which he received a sentence of four years confinement. Additionally on September 22, 1995, the petitioner was convicted by plea of the offenses of Assault in the Second Degree and Assault on a Peace officer for which he received concurrent sentences of four years confinement.
At the heart of the petitioner's claim is his assertion that he suffers from seizures for which he requires anti-seizure prescriptive medication. He claims that the refusal of the Department of Corrections to provide these anti-seizure medications to him constitutes cruel and unusual punishment.
For an action to be justiciable through a habeas petition, a claimant must raise issues which implicate the legality of his or her confinement. The parameters of habeas jurisdiction may also encompass those instances in which claimants assert constitutional violations related to the conditions of their confinement rather than the underlaying judgments which resulted in their confinements. A claim of cruel and unusual punishment, if properly framed, does implicate habeas jurisdiction. cf.Sanchez v. Warden, 214 Conn. 23 (1990). "Cruel and unusual punishment refers to punishment that involves the unnecessary and wanton infliction of pain or is grossly disproportionate to the severity of the crime." Santiago v. Commissioner, 39 Conn. App. 674
(1995). "In its prohibition of cruel and unusual punishments, the Eighth Amendment places restraints on prison officials . . . the Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must take reasonable measures to guarantee the CT Page 8687 safety of the inmates." Id. at 683.
As applied to the constitutional requirement for medical care, the standard was set forth by the United States Supreme Court in Estelle v. Gamble, in which the court stated: "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the eighth amendment."429 U.S. 97, 104 (1976). The court further opined that, "In order to state a cognizant claim, a prisoner must allege acts of omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend `evolving standards of decency' in violation of the Eighth Amendment." Id. at 106. It is with these standards in mind that the court examines the petitioner's claims.
At the time of his arrest in August of 1995, the petitioner was taking the prescriptive medications tegretol and phenobarbital, both prescribed for him as a result of a history of seizures. While the petitioner's pre-incarceration hospital and medical records were not adduced at the hearing, the petitioner testified that he had suffered two traumatic head injuries, and that he had suffered from spinal meningitis prior to his 1995 arrest.
The petitioner's sister, Delores Laws, testified credibly that the petitioner has a history of seizure activity. She indicated that she is familiar with the petitioner's illness and that he has been experiencing seizures for the past thirteen to fourteen years. She also indicated that the petitioner has been treated for epilepsy at the Yale University Medical Center, at St. Vincent's Hospital, and at the Bridgeport Hospital, and that he has been treated with dilantin as well as tegretol as anti-convulsive medications. Ms. Laws, who testified that she has witnessed the petitioner's seizure activities, indicated that she has noted his combative and unresponsive behavior during seizures. Additionally, she has noted that during these episodes he has appeared to be withdrawn, holding to walls, lying on the floor. She has seen him have tremors with his body being thrown back and forth and spinning in circles.
Ms. Laws also testified that the petitioner has a history of substance abuse, including a cocaine addition.
In addition a Ms. Laws, the petitioner called Richard CT Page 8688 Reynolds who is a captain in the Department of Corrections as well as the petitioner's cousin. The court found Captain Reynolds, as Ms. Laws, to be a credible and reliable witness. Captain Reynolds, who has known the petitioner for approximately twenty years, testified that he has known the petitioner to have seizures. He described the petitioner's seizure behavior as sometimes thrashing about, flopping around, with the petitioner sometimes babbling to himself and urinating on himself.
The petitioner claims that he has continued to suffer from seizures while in custody. The available evidence, however, belies this claim. On August 25, 1995, when the petitioner was transferred to the Northern Correctional Institution his behavior during initial processing was video taped and viewed during the hearing. Respondent's Exhibit A, Department of Corrections videotape, August 25, 1995. On the tape, the petitioner can be seen placing a blanket and a bed mattress up against the glass to prevent outside viewing into his cell. When he is given a direct order to place his hands in a slot so he can be handcuffed, he fails to respond. Additionally, he can be seen removing his clothes, and, at one point, drinking water from his cell toilet. At no time are his movements jerky or spasmatic. Video recordings of his behaviors on February 23, 1996 (Petitioner's Exhibit 6), August 2, 1996 and August 18, 1996 (Petitioner's Exhibit 5) all fail to demonstrate behaviors and body movements normally associated with seizure activity.
During the hearing, the respondent called Edward Blanchette, M.D., who is the Director of Clinical Medicine for the Department of Corrections. Dr. Blanchette, who had reviewed the petitioner's medical file and who was familiar with the episodes depicted on the video tapes, testified that the behaviors manifested by the petitioner are not indicative of seizure activity. As a matter of definition, Dr. Blanchette characterized a seizure as abnormal electrical activity of neurons that conduct electricity in the brain, a burst of intense activity usually of no more duration than ninety (90) seconds. From his review of the video tapes as well as anecdotal information concerning the petitioner's behavior during episodes the petitioner describes as seizures, Dr. Blanchette has determined that these events were not seizures. While uncertain of the cause of these behaviors Dr. Blanchette testified to his belief that they either reflect mental health issues or that the petitioner may be malingering. Dr. Blanchette testified that, based on his experience as a physician working within the corrections system, it is not CT Page 8689 unusual for an inmate to feign bizarre behaviors in order to obtain prescriptive medications, or simply to draw attention to one's self.
For a substantial period of time, the petitioner was afforded anti seizure medication by the Department of Corrections. Although there was a brief interruption in the availability of prescriptive medication to the petitioner upon his arrest and initially processing, seizure medications were prescribed for the petitioner by Department of Corrections medical personnel until July of 1996 when the medications were stopped. While the initial decision of the Department to continue the petitioner on anti-convulsive medications was based on his reports of past and ongoing seizure activity, E.M. McCoy, M.D., a Department of Corrections staff physician, testified that he became increasingly suspicious that the petitioner was not, in fact, experiencing seizures.
As a result of his uncertainty, and in order to finally resolve lingering questions about the nature of the petitioner's episodes, the Department arranged for the petitioner to have an electroencephalogram (EEG) at the University of Connecticut Health Center on February 27, 1996. As indicated by Dr. Blanchette, an EEG is an examination which measures brain wave movement to enable the examiner to determine whether there is any ongoing seizure activity. This EEG report was introduced into evidence as a part of the petitioner's Corrections medical file. Petitioner's Exhibit 2. The physician conducting the EEG reported that during the examination the petitioner experienced an episode typical of behaviors the petitioner had claimed to be seizures. Nevertheless, the EEG indicated no epileptic activity. Based on this objective negative finding, the Department Medical Staff determined to gradually remove the petitioner's regimen of anti-seizure medications. As a consequence, his dosage was reduced and finally eliminated by July 1996.
Based on this history, the court finds that it does not constitute cruel and unusual punishment for the respondent to refuse to provide anti-seizure medication to the petitioner. While the court is concerned from the history given in testimony by Delores Laws and Richard Reynolds that the petitioner may well have experienced seizures in the past, and this likelihood has not been ruled out by the respondent medical staff, there is no evidence that the petitioner does now or has in the past several months suffered from any epileptic episodes. Thus, while the CT Page 8690 court believes that the petitioner's health status bears close monitoring, the court is unpersuaded that the quality of medical care afforded to him by the respondent is violative of his constitutionally protected rights.
For the reasons stated, the medical aspect of this petition is dismissed.
Bishop, J.